UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| FIRST FINANCIAL BANK, N.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:11-cv-0226-WTL-DML |
| | ) |
| CITIBANK, N.A., and MISTY Y. McDONALD, | ) |
| | ) |
| Defendants. | ) |

## Entry on Defendant McDonald's Motion to Compel

Defendant Misty Y. McDonald has moved (Dkt. 54) the court to compel plaintiff First Financial Bank, N.A. ("FFB") to produce certain documents that FFB claims are protected from disclosure by either the attorney-client privilege or the work product doctrine. FFB provided the documents for *in camera* review as the court ordered. (Dkt. 63).

The subject documents are all email communications, dated between July 14, 2010 and July 23, 2010, between Steve Herndon and Norman L. Lowery. Mr. Herndon is, and was at the time of the communications, FFB's Security and Compliance Manager. Mr. Lowery is, and was at the time of the communications, FFB's Chief Executive Officer. He is also a lawyer. For two of the subject email communications, Brittany E. Bennett was copied on the email. She is, and was at the time of the communications, FFB's in-house counsel.

The privilege log initially supplied by FFB with its document responses stated that the documents were being withheld as attorney-client privileged communications. Later, in the course of the parties' Fed. R. Civ. P. 37 and Local Rule 37-1 discussions regarding the propriety of FFB's attorney-client privilege assertion, FFB stated that it objected to disclosure also on

work product grounds and it updated its privilege log to add that ground. Ms. McDonald urges the court to find that FFB waived the work product objection by failing to include that ground in the original privilege log. The court declines to rest its decision on waiver and will reach the merits of the work product objection.[1]

The factual background discussed below helps to put the subject communications in context, which is important in evaluating the applicability of both the attorney-client privilege and work product doctrine.

## Factual Background[2]

This case concerns a "bad" check in the amount of $298,750. The check was purportedly drawn on an account at defendant Citibank, made payable to defendant Misty McDonald, deposited by Ms. McDonald in her account at plaintiff FFB, and the representative funds of which were paid—at Ms. McDonald's request—by FFB via wire transfer to the Bank of China in Beijing, China before FFB received notice of the check's nonpayment.[3]

---

[1] Although the court does not agree with FFB that its invocation of a general work product objection in its written discovery responses was sufficient to inform Ms. McDonald (or the court) that FFB claimed a work product objection to producing the subject documents, the court finds good cause for FFB to raise the objection later. FFB amended its privilege log promptly upon Ms. McDonald's challenge to the propriety of withholding the documents at all and Ms. McDonald is not prejudiced by addressing the work product objection on the merits.

[2] These background facts are derived from the parties' filings and are provided to give context to the discovery dispute. They are not findings of the court.

[3] Ms. McDonald is an attorney. As the court understands the facts, she was contacted by a would-be client to help it collect a debt and agreed to accept the engagement. She received the $298,750 check from her client's purported debtor to satisfy the debt. Under an agreement with her client, she deposited the check in her trust account, kept 10% as the agreed fee for professional legal services, and then requested her bank (FFB) to wire transfer the remainder to her client's representative in care of an account at the Bank of China. The check from the purported debtor was not, however, written on an actual bank account and was part of a scam transaction. This type of transaction, in which an entity seeks out a lawyer to collect a "debt," the debtor pays up quickly with a check that later proves to be bogus but the lawyer already has arranged to wire proceeds (minus a fee) out of the country, is a scam that has become widely

Ms. McDonald deposited the check with FFB on July 7, 2010, which sent the check to the paying bank, Citibank, to collect the funds represented by the check. On July 8, 2010, Citibank returned the check through the Federal Reserve Bank of Cleveland (a clearing bank), and sent notice of nonpayment because the account number on the check was not one it could identify as a Citibank account. Because of a coding error by Citibank, its July 8 notice of nonpayment was sent to JP Morgan Chase and not FFB. (*See* Complaint, Dkt. 1, ¶¶ 11, 15, 16). By regular mail on July 9, 2010, JP Morgan Chase issued a notice to FFB that the check was being returned for nonpayment. That same day, however, at Ms. McDonald's request, $268,825 was wired from Ms. McDonald's account to the Bank of China, representing the check amount minus a 10% collection fee. (*Id.*, ¶ 17-18). On July 13, JP Morgan Chase sent another notice by regular mail to FFB, also reporting that the check was being returned for nonpayment. (*Id.*, ¶ 19). On July 15, FFB received JP Morgan Chase's first notice. In response, and apparently as of July 15, FFB (i) gave notice to Citibank of Citibank's failure timely to notify FFB of nonpayment and failure timely to return the check; (ii) submitted a claim to the Federal Reserve Bank to attempt to resolve with Citibank the issue of nonpayment; and (iii) asserted charge-back and set-off rights against Ms. McDonald's deposit account. (*Id.*, ¶¶ 20-22).

About this same time, FFB also contacted the Bank of China to request return of the wire transfer but, on July 19, the Bank of China reported that it had paid the beneficiary of the wire transfer on July 12 and thus had no funds to return. (*Id.*, ¶¶ 23-24). On July 22, 2010, Citibank responded to FFB's claim to the Federal Reserve Bank and stated that it had done everything it was supposed to do regarding the check. (*Id.*, ¶ 25).

---

reported in the American legal press. *E.g.,* "Scammers Take Aim at Lawyers," Oregon State Bar Bulletin, May 2010, www.osbar.org/publications/bulletin/10may/barcounsel.html (last visited December 30, 2011).

About seven months later, on February 14, 2011, FFB filed this lawsuit against Ms. McDonald and Citibank. It alleges that Citibank breached various warranties to FFB provided under federal banking regulations, that Ms. McDonald breached warranties to FFB provided under the UCC as adopted in Indiana, and that she also committed check deception entitling FFB to relief under Indiana's Offenses Against Property Act.

## Analysis

### Work Product Doctrine

The court addresses first the work product objection made by FFB. FFB's ability to withhold documents based on the work product doctrine is a question of federal law, and is defined by Fed. R. Civ. P. 26(b)(3). *E.g., Flomo v. Bridgestone Americas Holding, Inc.,* 2010 WL 2484266 at *1 (S.D. Ind. June 14, 2010); *In re Professionals Direct Ins. Co.,* 578 F.3d 432, 438 (6th Cir. 2009) (work product doctrine is procedural rule of federal law). The work product doctrine protects from disclosure (1) documents and tangible things (2) prepared in anticipation of litigation or for trial (3) by or for a party or its representatives. Fed. R. Civ. P. 23(b)(3). The party asserting work product protection for a document bears the burden to establish that the document meets the definitional requirements for work product. *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 976 (7th Cir. 1996).

Documents prepared as part of the normal course of a client's business, in contrast to documents prepared because of the prospect of litigation, may not be withheld on work product grounds. *Binks Mfg. Co. v. National Presto Industries, Inc.,* 709 F.2d 1109, 1118 (7th Cir. 1983) (citing *Janicker v. George Washington University,* 94 F.R.D. 648, 650 (D.D.C. 1982)). Sometimes, a document is prepared both for ordinary business purposes and because of the prospect of litigation. A document that serves dual purposes *may* be protected work product

under Rule 26(b)(3), but only where the "'primary motivating purpose behind the creation of a document or investigative report [is] to aid in possible future litigation.'" *Id.* (quoting *Janicker*, 94 F.R.D. at 650).

FFB argues that because it identified the documents as responsive to Ms. McDonald's discovery request for documents that pertained to "any investigation of the facts and circumstances giving rise to the allegations" in its complaint, then it necessarily follows that the documents were prepared in anticipation of litigation or contain the mental impressions of its attorneys, including its in-house counsel and its chief executive officer (who happens to be a lawyer). (Dkt. 61, p. 7). Relatedly, FFB contends that its factual investigation was necessary to its development of a "legal response to the situation" (thus also implicating the mental impressions of its lawyers), including its making a claim with the Federal Reserve Bank as to Citibank's actions and asserting set-off rights against Ms. McDonald's deposit account. (*Id.,* p. 8). The court need not reach the issue whether the communications reflect attorney mental impressions because it finds as a threshold matter, as discussed below, that FFB has not met its burden to show that the documents were prepared in anticipation of litigation.

FFB's descriptions of its use of the documents and the information contained in them are insufficient to show that the "primary motivating purpose" for their creation was *because* of the prospect of litigation. FFB's arguments instead reveal that as part of the regular and ordinary course of its banking business FFB investigates "bad" (or "unpaid") checks and decides on courses of action it may take in the ordinary course of the banking business—as through the Federal Reserve Bank and exercising contractual set-off rights—without any prospect of litigation. The timing of the communications is also strong evidence that the communications were not prepared primarily because of the prospect of litigation and to aid in that litigation

5

(litigation that FFB did not bring for another seven months). These emails were written in the first days after FFB learned that it had wired nearly $300,000 against a check that was returned unpaid. It could be expected that even without any prospect of litigation, the bank's Security and Compliance Manager (Mr. Herndon, the author or recipient of the emails) would conduct an immediate factual investigation and report to, and receive responses from, the bank's Chief Executive Officer (Mr. Lowery) regarding that investigation and possible courses of action by the bank. Indeed, it is nearly impossible to imagine that these sorts of communications were created primarily because litigation could be expected to ensue. *See Binks,* 709 F.2d at 1109 (quoting *Janicker,* 94 F.R.D. at 650) ("'If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery'").

There is no showing that the primary motivating purpose for the email communications was litigation. The documents may not be withheld on work product grounds.

**<u>Attorney Client Privilege</u>**

In federal court, privileges are governed by federal common law except that with respect to a claim where state law provides the substantive rule of decision, privileges are determined in accordance with the applicable state law. Fed. R. Evid. 501. This suit combines federal and state law claims. Both FFB and Ms. McDonald cite case law applying the federal common law of attorney-client privilege and Indiana's attorney-client privilege and the court will do the same. Nothing suggests that the analyses would be different depending on which law was applied.

Indiana's attorney client privilege is an evidentiary privilege codified at Ind. Code § 34-46-3-1:

> Except as otherwise provided by statute, the following persons shall not be
> required to testify regarding the following communications: (1) Attorneys, as to

6

>confidential communications made to them in the course of their professional business, and as to advice given in such cases.

The Seventh Circuit describes the federal common law of privilege similarly. The "essential general principles" are:

>(1)Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. Evans,* 113 F.3d 1457, 1461 (7th Cir. 1997) (quoting 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2292 (John T. McNaughton rev. 1961)). *See also Shaffer v. American Medical Ass'n.,* 662 F.3d 439, 446 (7th Cir. 2011) (to fall under privilege, communication "must have been made in confidence, in the connection with the provision of legal services, to an attorney, and in the context of an attorney-client relationship").

The privilege is narrowly construed, and the party who withholds a communication as privileged has the burden to prove its applicability, on a communication-by-communication or document-by-document basis. *Shaffer,* 662 F.3d at 446; *Howard v. Dravet,* 813 N.E.2d 1217, 1222 (Ind. Ct. App. 2004).

A business entity, like FFB, may invoke the privilege. *Upjohn Co. v. United States,* 449 U.S. 383 (1981); *In re Witham Memorial Hosp.,* 706 N.E.2d 1087, 1091 (Ind. Ct. App. 1999) (relying on *Upjohn*). The corporate context, however, can pose challenges to application of the privilege because of the difficultly in some circumstances in distinguishing between communications made to obtain business—as opposed to legal—advice; or, where the communications are with in-house counsel, distinguishing whether counsel was acting in his legal—as opposed to a general business—capacity. *See, e.g., United States v. Singhal,* 800

7

F.Supp.2d 1, 9 (D.D.C. 2011); *Lindley v. Life Investors Ins. Co.,* 267 F.R.D. 382, 391 (N.D. Okla. 2010); *Southeastern Pennsylvania Trans. Auth. v. Caremarkpcs Health, L.P.,* 254 F.R.D. 253, 257-58 (E.D. Pa. 2008); *LaFarge North America, Inc. v. Matraco-Colorado, Inc.,* 2008 WL 2474638 at *5 (S.D. Fla. June 19, 2008). Because business considerations may be intertwined with legal advice in the corporate setting, courts generally require a showing that the predominant or primary purposes of the communication was to impart information for the purpose of obtaining legal advice. *E.g., Singhal,* F.Supp.2d at 9; *Lindley,* 267 F.R.D. at 391.

FFB's invocation of the privilege for the email communications that Mr. Herndon had with Mr. Lowery, the company's Chief Executive Officer, heavily relies on Mr. Lowery's status as a "licensed attorney." (*See* FFB's opposition to motion to compel, Dkt. 61, at p. 6). That fact alone, of course, does not make communications with him privileged. FFB does not really confront and defuse the natural assumption that given his role as chief executive, Mr. Lowery more likely communicates in his capacity as the leader of the company, both when he receives and imparts information.

FFB provides no testimony from Mr. Lowery (or Mr. Herndon) that either understood Mr. Lowery to be acting primarily in a legal capacity for the company and was imparting legal advice. It simply asserts, without evidentiary support, that Mr. Herndon provided factual information to Mr. Lowery "and sought his legal advice" as to how FFB should respond to the issues raised by the unpaid check. It also maintains that Mr. Lowery uses his legal training in his job, and did so with respect to the matters involving the subject check. *Id.* A stronger showing than that must be made when Mr. Lowery's usual role is to make business decisions, and a different person altogether (Ms. Bennett as in-house counsel) is the corporation's formally-designated purveyor of legal advice. *See, e.g., Singhal,* 800 F.Supp.2d at 9 (where in-house

counsel has responsibilities as a corporate officer outside his duties as a lawyer and in-house counsel, corporation must make "clear showing" that the person was acting in his legal rather than business capacity).

The court's *in camera* review of the subject email communications confirms that the communications with Mr. Lowery were not to obtain legal advice from him in his capacity as a lawyer. Most of the communications do not seek advice at all from Mr. Lowery. The content and context of the communications reveals that Mr. Lowery was not being asked to provide legal advice; rather, he was kept apprised of a $300,000 financial problem and was asked—in certain of the communications—to make business decisions in the face of that problem. Indeed, Mr. Lowery was acting as the client, not the lawyer.

The role of Ms. Bennett, the in-house counsel, also must be explored. She is copied on some of the email communications and mentioned in others. As with Mr. Lowery, the mere fact that Ms. Bennett is a lawyer and was the recipient of a communication does not make the communication with her privileged. *E.g., In re Avantel, S.A.,* 343 F.3d 311, 321 n.11 (5th Cir. 2003) (sending communications to in-house counsel does not make them privileged; if that were the case, corporations would routinely copy in-house counsel on every communication); *Wierciszewski v. Granite City Illinois Hosp. Co.,* 2011 WL 5374114 at *2 (S.D. Ill. Nov. 7, 2011) (copying of counsel on email does not make it privileged; communications between employees at least must be directed at counsel for purpose of seeking legal advice). Communications with her are privileged only if they were made primarily to obtain her legal advice. *Id.; see also Lindley,* 267 F.R.D. at 391. As to Ms. Bennett's role, FFB states that "in some of the withheld documents," FFB employees were directed to get advice from Ms. Bennett or were reporting Ms. Bennett's advice to Mr. Lowery.

9

Based on the court's *in camera* review of the email communications, the court is persuaded that portions of some of them do reflect communications with Ms. Bennett primarily to obtain her legal advice or otherwise report her legal advice. They are:

1. The second sentence of the July 15, 2010, 3:20 pm email (FFB-000144).

2. The last paragraph of the July 23, 2010, 12:03 pm email (FFB-000148).

3. The entire email dated July 23, 2010, 1:50 pm (FFB-000149).

All of the other emails, or portions of them not excepted above, must be produced.

## Conclusion

Consistent with the foregoing discussion, the court finds that, in the main, FFB has not met its burden to establish that either the work product doctrine or attorney-client privilege applies to the subject documents. Ms. McDonald's motion to compel (Dkt. 54) is GRANTED in PART and DENIED in PART. FFB must produce within 10 days of this entry all of the emails except FFB-000149 and those portions of FFB-000144 and FFB-000148 described in this entry.

So ORDERED.

Date: __02/24/2012__

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution to all counsel of record via CM/ECF